IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 20-00094-01-CR-W-DGK |
| | ) | |
| XZAVIER D. RODGERS | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO
DENY DEFENDANT'S MOTION TO SUPPRESS**

Before the Court is Defendant Xzavier Rodgers's Motion to Suppress Evidence. Doc. 27. Defendant moves the Court to suppress evidence seized during a search of a residence. For the following reasons, Defendant's motion should be denied.

**I. PROCEDURAL BACKGROUND**

On May 26, 2020, the grand jury returned a one-count Indictment charging Defendant with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Doc. 1. Defendant filed his motion to suppress evidence on April 1, 2021, seeking suppression of any and all evidence obtained from a residence at 2230 S. Vermont Ave., Independence, Missouri on February 4, 2020, including the semi-automatic handgun seized by law enforcement officers which is the basis for the charge at issue in this case. Doc. 27. The Government filed its response on April 15, 2021. Doc. 31.

An evidentiary hearing was held on April 28, 2021, with all parties and counsel appearing in person. The Government called FBI Special Agents Jason Robert Ramsey and Richard Weiler as witnesses. The following exhibits were admitted into evidence:

Government's Exhibit 1: Indictment and Arrest Warrant for Derrick C. Davis

1

Government's Exhibit 2: Diagram of residence
Government's Exhibit 3: Photograph of doorway into residence
Government's Exhibit 4: Photograph of exterior door of residence
Government's Exhibit 5: Photograph of residence interior looking through dining room
Government's Exhibit 6: Photograph of hallway looking into west bedroom
Government's Exhibit 7: Photograph looking into west bedroom before execution of search warrant
Government's Exhibit 8: Photograph looking into west bedroom after execution of search warrant
Government's Exhibit 9: Photograph of bed and closet in west bedroom with box springs removed
Government's Exhibit 10: Photograph of clothes hanging in bedroom closet
Government's Exhibit 11: Photograph of top shelf in bedroom closet
Government's Exhibit 12: Photograph of closet floor
Government's Exhibit 13: Photograph of firearm as discovered in bedroom closet with "stovepiped" round protruding from the firearm
Government's Exhibit 14: Close-up photograph of firearm as discovered in bedroom closet with "stovepiped" round protruding from the firearm
Government's Exhibit 15: Photograph of west bedroom showing end of bed with mattress and box springs removed
Government's Exhibit 16: Photograph of west bedroom showing head of bed with mattress and box springs removed
Government's Exhibit 17: Photograph of bed frame with mattress and box springs removed with firearm visible on the floor
Government's Exhibit 18: Close-up photograph of bed frame with mattress and box springs removed with firearm visible
Government's Exhibit 19: Close-up photograph of assault-style firearm still lying on floor underneath bed frame with mattress and box springs removed
Government's Exhibit 20: Close-up photograph of assault-style firearm with magazine and ammunition removed
Government's Exhibit 21: Close-up photograph of assault-style firearm showing serial number and safety in the "fire" position
Government's Exhibit 22: Close-up photograph of semi-automatic handgun with magazine and ammunition removed
Government's Exhibit 23: Close-up photograph of semi-automatic handgun
Government's Exhibit 24: Close-up photograph of white pill
Government's Exhibit 25: Application for Search Warrant and Signed Search and Seizure Warrant authorizing search of the residence at 2230 S. Vermont Ave.
Government's Exhibit 26: FBI Receipt for Property received from 2230 S. Vermont Ave.
Government's Exhibit 27: Photograph of property receipt and search warrant left on table at residence

Closing arguments were presented, after which the Court took the matter under advisement.

## II. PROPOSED FINDINGS OF FACT

On the basis of the evidence presented at the suppression hearing, the undersigned submits the following proposed findings of fact:

1. Special Agent Jason Robert Ramsey has been employed with the FBI since 2009, and he has been assigned to the Kansas City office since 2013. Tr. at 10. Previously he worked in the FBI's New York office, and before that he briefly worked in the Beaumont, Texas office. Tr. at 13. Prior to joining the FBI in 2009, Special Agent Ramsey was a police officer for six years where his duties included serving on the SWAT team for his department. Tr. at 15. Prior to that, he served in the US Navy where he was trained in high-value target movements and conducted protective service detail special operations. Tr. at 15.

2. Special Agent Ramsey is currently the FBI SWAT team leader for the Kansas City office, a role he has held for approximately one year. Tr. at 10-11. His responsibilities as team leader include managing team operations, performing pre-operation investigations, taking pictures, writing up plans, and setting up the team for safe and effective deployment. Tr. at 10-11. Prior to serving as SWAT team leader, he was the assistant SWAT team leader and a member and coordinator of the Kansas City Career Criminal Task Force. Tr. at 12. While in New York, he was a member of the New York SWAT team, and in Beaumont, Texas, he was the Violent Crimes coordinator for a task force. Tr. at 13.

3. Special Agent Ramsey also serves as a tactical instructor and firearms instructor for the Kansas City office. Tr. at 11. As a tactical instructor, he teaches, among other things, how to clear a house, mission planning for agents executing arrest or search warrants, and search and seizure. Tr. at 11. As a firearms instructor, he teaches agents to be proficient in firearms use and continuously tests the agents to ensure they perform at the levels required. Tr. at 11.

4. While on the Career Criminal Task Force, Special Agent Ramsey investigated Hobbes Act Robberies, homicides, serial killers, and highway shooters. Tr. at 12-13.

5. Special Agent Ramsey's training includes completing police academy training in Kansas and completing the FBI's six-month training for agents when he initially joined the FBI, a program which included training in clearing houses. Tr. at 13-15. To become an FBI SWAT team leader, Special Agent Ramsey had to first try out and become a member of a SWAT team before engaging in extensive ongoing training including earning and maintaining numerous certifications. Tr. at 13-14. Special Agent Ramsey has led or participated in several hundred SWAT operations for the FBI. Tr. at 13.

6. Special Agent Weiler has been employed by the FBI for 24 years. Tr. at 93. He was a member of the SWAT team, and he served as the sniper team leader until August of 2020. Tr. at 94. Before joining the FBI, Special Agent Weiler was a police officer for nine years. Tr. at 94. Special Agent Weiler's training includes completing police academy, the FBI's

training for new agents, and numerous SWAT trainings. Tr. at 94-95. Special Agent Weiler has participated in over 700 SWAT operations or missions. Tr. at 97.

7.  In the Spring of 2019, Special Agent Ramsey was involved in the Career Criminal Task Force's investigation of a series of armed robberies of cell phone stores in the Kansas City area. Tr. at 16. It was believed that at least 13 robberies were conducted by the same robbery crew. Tr. at 16. Almost all of the robberies were captured on video. Tr. at 16. They were "take-over style robberies" where the armed suspects would put guns to individuals' heads and force people at gunpoint into back rooms of stores. Tr. at 17.

8.  A suspect named Derrick Davis was believed to be one of the members of this robbery crew. Tr. at 17. In an Indictment dated January 28, 2020, Derrick Davis was charged with conspiracy to commit robbery, Hobbs Act robbery, and brandishing a firearm in furtherance of a crime of violence. Tr. at 18; Ex. 1. A warrant was issued for Derrick Davis's arrest. Tr. at 18-19; Ex. 1.

9.  Special Agent Ramsey was in charge of organizing the operation to arrest Derrick Davis, during which he learned that Davis was residing at 2230 S. Vermont Ave., in Independence, Missouri ("the residence"). Tr. at 19-20. In briefing the SWAT team, Special Agent Ramsey informed the team members that Davis was known to carry a gun while committing Hobbs Act robberies. Tr. at 21, 98.

10. Special Agent Ramsey did not know how many people would be present in the residence when the warrant was executed. Tr. at 21-22. He suspected that Davis's mother lived there, and surveillance indicated that several other people would come and go from the residence. Tr. at 22.

11. On February 4, 2020, approximately 13 SWAT team members were present to execute the arrest warrant at the residence. Tr. at 23. SWAT members wear uniforms with body armor and placards on the front and back that say "FBI." Tr. at 25, 99. Numerous other task force and local law enforcement personnel were present to establish an outer perimeter and provide support as directed. Tr. at 23. The warrant was executed at approximately 6:00 a.m. Tr. at 22, 24. Warrants are typically served at this time of day because it is found to be safer and more effective for numerous reasons. Tr. at 24.

12. Special Agent Ramsey was at the north door of the residence with the majority of the SWAT team, including Special Agent Weiler. Tr. at 25, 102-03. Another group of team members was positioned at the east door. Tr. at 25. All of the law enforcement vehicles present turned on their emergency lights. Tr. at 25, 26.

13. With the team members in position, Special Agent Ramsey instructed the assigned agents to "knock and announce." Tr. at 26. The agent banged on the door and yelled "FBI, arrest warrant, come to the door" several times. Tr. at 26. After waiting for a response and hearing none, the agent knocked and announced again. Tr. at 26-27.

4

14. Special Agent Ramsey could hear movement in the house, but no one was coming to the door. Tr. at 27. Having not received any response from inside the house, Special Agent Ramsey ordered the door breached with a ram. Tr. at 28. The team entered the residence, with various members going to clear different rooms while the rest of the team moved down a hallway. Tr. at 28, 106.

15. The team stopped at the end of the wall in the hallway. Tr. at 29. Special Agent Weiler was in the front, with Special Agent Ramsey fourth or fifth back in the group. Tr. at 29, 106.

16. Special Agent Weiler was able to partially see into the back bedroom of the residence, and he observed feet visible on the bed. Tr. at 30, 109. The bedroom in question is marked as "Bedroom 2" and "Son's Room" on the diagram of the home. See Tr. at 31, 109; Ex. 2. The view into the bedroom from the agents' vantage point in the hallway is depicted in Government's Exhibit 6. Tr. at 33, 113; Ex. 6. Only a small portion of the bedroom was visible from the hallway. Tr. at 34. Special Agent Weiler yelled commands for people to show their hands and come out of the room. Tr. at 31, 109.

17. When taking multiple people into custody, agents instruct people to come out one at a time. Tr. at 32. Agents further back in the team will step around the lead agent to take the person into custody, with the lead agent continuing to cover the doorway. Tr. at 32.

18. Derrick Davis's mother exited the room and was taken into custody. Tr. at 31, 110. She was uncooperative with agents, but she was eventually removed from the hallway. Tr. at 33. Defendant Xzavier Rodgers was the second person to exit the room. Tr. at 34. A third person (female) exited and was taken into custody as well. Tr. at 35-36.

19. Surveillance had indicated that Derrick Davis was in the residence, and they knew they had yet to apprehend him. Tr. at 36. Not knowing how many people were in the bedroom due to the limited visibility from their vantage point, but believing Derrick Davis was present in the bedroom, the team continued to call for him to come out, but Davis did not comply with repeated commands. Tr. at 36-37. After 15 to 20 seconds of calling out commands, Derrick Davis showed his hands. Tr. at 37, 113. While they were waiting for Derrick Davis to show his hands, Special Agent Ramsey began prepping a flashbang grenade in the event the team needed to enter the bedroom to retrieve Derrick Davis. Tr. at 37. Due to Derrick Davis's delay in responding, Special Agent Ramsey was concerned that Derrick Davis was contemplating fleeing or using a weapon to avoid being apprehended. Tr. at 37.

20. Derrick Davis emerged from the room, and he was taken into custody. Tr. at 38. After Davis was taken past the agents, Special Agents Ramsey and Weiler immediately entered the room. Tr. at 38-39, 89. Even though four people including Derrick Davis had been taken into custody, and someone had stated that only four people were in the bedroom, Special Agent Ramsey wanted to ensure that no one else was present because, in his experience, people will often lie about how many people are present. Tr. at 36, 48.

5

21.     Special Agents Ramsey and Weiler immediately entered the room, with Special Agent Ramsey immediately turning left into the room, consistent with standard procedures for clearing a room of that layout.  Tr. at 39, 116.  When clearing a room, agents have a hierarchy of potential threats to consider.  Tr. at 39.  The closet door to Special Agent Ramsey's left was highest priority, so he entered the closet.  Tr. at 39-40.  The closet door was open when he entered the room.  Tr. at 51.  Special Agent Ramsey always checks closets for people, and he has found people hiding in closets more than 25 times.  Tr. at 46.  The closet was large enough for Special Agent Ramsey to physically enter it.  Tr. at 88-89.

22.     In the closet, Special Agent Ramsey moved hanging clothes and used his foot to step on clothing on the floor to make sure a person was not hiding.  Tr. at 40.  In the back left corner of the closet, Special Agent Ramsey observed a Glock handgun with a round sticking out of the top of the gun.  Tr. at 40.  He did not touch or otherwise move the firearm.  Tr. at 42.

23.     Special Agent Ramsey then turned around and saw Special Agent Weiler pointing his firearm at the bed, indicating to Special Agent Ramsey that the bed was the next priority in the room.  Tr. at 41, 117.  Special Agent Ramsey has found people under beds numerous times, including armed individuals.  Tr. at 46.  Special Agent Weiler has also found people hiding under beds.  Tr. at 117.  Special Agent Ramsey got down to quickly look under the bed to see if there was any indication that a person was hiding under the bed.  Tr. at 41, 43, 118.  Moving a bed requires Special Agent Ramsey to sling his rifle, leaving him effectively unarmed in that moment.  Tr. at 43.  Having found someone under a bed before without checking first, Special Agent Ramsey now briefly looks under a bed first before moving it for his own safety.  Tr. at 43.

24.     When he looked under the bed, Special Agent Ramsey observed the end of a firearm.  Tr. at 42-43, 44.  Special Agent Ramsey then attempted to lift the bed, and with Special Agent Weiler's help, the mattress and box springs were removed.  Tr. at 44, 118.  With the mattress and box springs removed, an assault pistol with drum magazines was visible.  Tr. at 44-45, 119.  When exiting the bedroom, Special Agent Ramsey observed a pill on a dresser that he suspected was a narcotic.  Tr. at 58; Ex. 26.

25.     It took Special Agents Ramsey and Weiler approximately 20-30 seconds to check the bedroom, including checking the closet and flipping the bed.  Tr. at 49.

26.     After the entire house had been cleared by the SWAT team, Special Agent Ramsey contacted a task force officer and relayed what happened while executing the arrest warrant, including describing the firearms and pill observed in the bedroom.  Tr. at 55.  The task force officer used this information to apply for and obtain a search warrant.  Tr. at 55, 86.  Law enforcement personnel secured the house while they were waiting on the warrant.  Tr. at 55.  After a search warrant was obtained, the house was searched and the firearms were seized.  Tr. at 56.

27. The parties stipulated that if called to testify, Defendant Rodgers would testify that his mother was the lawful occupant of the residence; that he was an overnight guest in her home on February 3rd into February 4th, 2020, and that he had open access to the home.

### III. PARTIES' ARGUMENTS

Defendant Rodgers argues that the initial search of the bedroom, during which agents located two firearms, exceeded the narrow scope of a constitutionally permissible protective sweep. He argues that the bedroom was not immediately adjacent to the place of arrest and that agents failed to rely on specific articulable facts to justify a protective sweep in the bedroom for any individual posing a threat to agent safety. He also claims that the search was not limited to a cursory visual inspection of the room and that acts such as removing the box spring and mattress from the bedframe fell outside of the narrow scope of a protective sweep.

The Government responds that the search of the bedroom was justified as a protective sweep. The Government first argues that the bedroom was immediately adjacent to the place of arrest, such that the agents were not required to possess probable cause or reasonable suspicion for their search of the bedroom. Alternatively, the Government contends that if the bedroom was determined not to be immediately adjacent to the place of arrest, specific, articulable facts supported the agents' reasonable suspicion that other individuals may be hiding in the bedroom, and that their search of the bedroom – including under the bedframe – fell within the narrow confines of a protective sweep. Finally, the Government argues that if the Court would find that the search was not justified, the good-faith exception to the exclusionary rule should be applied because the agents later relied in good faith on a search warrant when they ultimately seized the weapons at issue here.[1]

---

[1] The parties also presented arguments regarding whether or not Defendant Rodgers was an overnight guest in the home and therefore had a reasonable expectation of privacy such that he had standing to challenge the seizure of evidence from the home. Given the stipulation set forth in Fact 27, the Court views the Government as having conceded this issue for the limited purposes of this motion and

7

Case 4:20-cr-00094-DGK    Document 40    Filed 05/28/21    Page 7 of 12

## IV. DISCUSSION

There are a few exceptions to the Fourth Amendment's requirement "that a warrant be issued by a neutral magistrate [judge] on probable cause before an item can be searched or seized…, [and if] the government wishes to rely on an exception, it bears the burden of demonstrating that the exception exists." *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003) (internal citations omitted). "One such exception is the 'protective sweep.'" *United States v. Alatorre*, 863 F.3d 810, 813 (8th Cir. 2017).

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). The Fourth Amendment permits such sweeps if searching officers "possessed a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted' the officer in believing…that the area swept harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. at 327 (internal citations omitted). If the area searched is "immediately adjoining the place of arrest," officers do not even need "probable cause" or "reasonable suspicion" to justify the search. *Id.* at 334.

A protective sweep may last "no longer than is necessary to dispel the reasonable suspicion of danger," *Id.* at 335, but a protective sweep "does not automatically end when a suspect is arrested." *United States v. Randy Jason Ford,* 888 F.3d 922, 928 (8th Cir. 2018) (citing *Alatorre,* 863 F.3d at 814-15). "[A]n officer arresting a [suspect] in one room of a multi-room residence is justified in conducting a *Buie* sweep out of concern that there could be

---

will assume that Defendant Rodgers was an overnight guest at the residence in analyzing the other issues presented by the parties.

individuals lurking in the other rooms who may resort to violence to thwart the arrest." *United States v. Green*, 560 F.3d 853, 856 (8th Cir. 2009) (citation omitted). "During a properly limited protective sweep, the police may seize an item that is in plain view if its incriminating character is 'immediately apparent.'" *Id.* (quoting *Horton v. California*, 496 U.S. 128, 136 (1990)).

At the outset, the Court considers the Government's contention that the bedroom was immediately adjoining the place of arrest and that the agents therefore did not need to form a reasonable belief that someone else was hiding in the room to conduct their sweep. In *Buie*, the case that established the protective sweep doctrine, the facts are remarkably similar to the present case. There, an officer executing an arrest warrant shouted into a basement, commanding anyone present to show their hands and come out. 494 U.S. at 328. When the suspect, after some delay, finally emerged from the basement, he was arrested and handcuffed after which officers entered the basement to see if anyone else was there. *Id.* No one was, but officers discovered clothing lying in plain view that linked the suspect to a crime. *Id.* The Supreme Court held that no warrant or reasonable suspicion was required to effectuate the search in an area "immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334.

Although the Supreme Court did not fully explain what constitutes "immediately adjoining" in *Buie*, the facts of this case are nearly identical. As in *Buie*, the target of an arrest warrant exited a room after some delay, after which agents entered the room he had just exited to ensure no one else was hiding. Facts 19, 20. Furthermore, as the photos and diagram plainly show, the hallway and bedroom, indeed the entire residence, was relatively small. *See, e.g.,* Ex. 2, Ex 6. Thus, even if agents retreated to the living room or even the porch outdoors to arrest and handcuff Davis, a threatening attack could indeed be launched from the bedroom.

9

Even if the bedroom was not viewed as immediately adjoining the place of arrest, the agents still possessed reasonable suspicion supported by specific, articulable facts to sweep the bedroom. The agents were executing an arrest warrant for an individual alleged to have committed a string of strikingly violent Hobbs Act robberies as part of a robbery crew. Facts 7, 8. They were not sure how many people were in the residence, and several individuals were known to come and go from the residence. Fact 10. Upon serving the warrant, they received no response to their initial knock and announce and had to breach the door. Facts 13, 14. Special Agent Ramsey could also hear movement before the door was breached. Fact 14. Derrick Davis did not initially respond to commands and only showed his hands and complied after 15-20 seconds of Special Agent Weiler shouting commands. Facts 19, 20. The delay was so great, Special Agent Ramsey contemplated using a flashbang to enter the bedroom. Fact 19. These facts and inferences were more than sufficient to justify the sweep of the bedroom. *See, e.g., United States v. Hanuman*, 821 Fed. Appx. 662 (8th Cir. 2020) (delay caused by having to breach front door supported officers' concerns that individuals had time to hide); *United States v. Waters*, 883 F.3d 1022 (8th Cir. 2018) (protective sweep of a residence justified when officers detected signs of movement prior to the arrest suggesting multiple individuals may have been in the home); *United States v. Alatorre*, 863 F.3d 810 (8th Cir. 2017) (holding a protective sweep of a residence was justified after the suspect was arrested on his porch because delays in answering the door and signs of movement inside prior to the arrest indicated others might have been in the premises and had time to hide); *United States v. Davis*, 471 F.3d 938, 945 (8th Cir. 2006) (holding that the defendant's suspected possession of firearms and possible associations with violent persons justified a protective sweep of a building near, but entirely separate from, the premises where the defendant was arrested).

Additionally, the scope of the protective sweep here was permissibly narrow. Common sense would dictate that closets are an obvious place to search for people hiding, and for good measure, the Supreme Court agrees. *See Buie*, 494 U.S. at 334. The bed, too, was a perfectly reasonable place to examine by lifting the mattress, as both agents had encountered people hiding under beds numerous times. *See United States v. Whitehead*, 995 F.3d 624, 626-27 (8th Cir. 2021) (holding that a search under a mattress fell within the scope of a protective sweep where officers testified they had found fugitives under beds before).[2] As to time, the 20-30 second sweep at issue here was considerably shorter than the two minutes deemed permissible in *Alatorre*. 863 F.3d at 815-16.

Defendant contends that a person could not possibly hide under the bed in this case, and that it was apparent just by looking at it that a person was not secreted underneath. Defendant's argument appears to be based on the low clearance between the floor and the bed frame. This emphasis is misplaced, as one could hide by lifting up the mattress and box spring instead of crawling underneath the bed from the floor. In any event, whether or not it was possible for a person to fit under this bed is immaterial, as the Eighth Circuit has also held that searching a space that proved to be too small to conceal a person was permissible when the officer could not ascertain as much until after the search was conducted. *See United States v. Green*, 560 F.3d 853, 856-57 (8th Cir. 2009). Finally, the contention that agents were required to believe

---

[2] In his motion, Defendant discusses the intersection of the plain view doctrine with protective sweeps. His argument is premised on the notion that agents had no justification to enter the bedroom at all, but he also suggests that by moving clothing in the closet and lifting the bed, the protective sweep in this case became an exploratory search and anything the agents observed was not, by its very nature, in plain view. Although *Buie* limits protective sweeps to cursory visual inspections, as the case law clearly implies, law enforcement may open closet doors, or, as in *Whitehead*, lift mattresses, so long as they are searching for people hiding and have reason to believe someone could or is hiding in the location being searched. If during this process an incriminating item, such as a firearm, is plainly visible, its seizure is justified even though it may not have been in plain view before a bed was lifted or a cluttered closet briefly entered and examined.

11

statements that only four people were in the residence and therefore could not enter the bedroom after Davis's apprehension is without support in the law. *See Waters*, 883 F.3d at 1025-27 (affirming a protective sweep conducted after apprehension of a suspect even though another individual stated that only the suspect was in a residence).

Therefore, in light of the foregoing, the protective sweep was permissible as a search of an area immediately adjacent to the place of an arrest. It was also justified by reasonable suspicions supported by specific, articulable facts and was sufficiently narrow in scope. Because the search was justified by the protective sweep exception to the Fourth Amendment, application of the good faith exception to the exclusionary rule is not necessary.

## V. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this Report and Recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the Report and Recommendation which are accepted or adopted by the District Judge except upon the ground of plain error or manifest injustice.

                                                    /s/ *Jill A. Morris*
                                                     JILL A. MORRIS
                               UNITED STATES MAGISTRATE JUDGE